In the Matter of the Application of THE CITY OF NEW YORK, Petitioner, for the Closing of City Hall Place.

Supreme Court, New York County, January 16, 1935.

*Paul Windels, Corporation Counsel [Anson Getman, Joseph F. Mulqueen, Jr., and Samuel Handel* of counsel], for the City of New York.

*Knox & Dooling, Medina & Sherpick [W. Gilbert* of counsel], *Green & Hurd* and *August G. Klages,* for the claimants.

ROSENMAN, J. This motion to dismiss the proceeding is granted. The proceeding is brought to close a street in the city of New York, pursuant to chapter 1006 of the Laws of 1895, as amended by chapter 752 of the Laws of 1923. The street involved, since 1794 and until recent years, has been a public street, so maintained by the city of New York, and so used by the public. It was formerly known as Augustus street, and more recently as City Hall place.

Prior to and about 1826 one George Janeway was the owner of a large plot of land, running north of Chambers street and extending westerly from Chatham street. The map of his property showed various streets, including Augustus street, which extended from Pearl street west to Duane street and beyond, and which was forty feet wide. The fee of the bed of the street was held by George Janeway. Although the street was for more than a hundred years a public street, the fee itself has never been acquired by the city of New York.

The claimants in this proceeding are either descendants of, or trace their title through the descendants of, George Janeway. Their claim rests on their fee ownership of the bed of the street.

In 1832 the city undertook to widen the street by a strip of about six feet. Compensation was paid therefor by the city to the Janeway estate.

In about 1914 the city took proceedings to acquire approximately all of the property north of Duane street to Worth street and east of Centre street to Baxter street for the new county courthouse. City Hall place, between Duane and Pearl streets, was included within this area. In the condemnation proceeding the city did not acquire the title to the bed of City Hall place, and has not up to the time of the commencement of this proceeding undertaken to do so.

The new county courthouse was constructed. A large plot of land was left unoccupied between Pearl and Duane streets, including City Hall place, which the city retained in its proprietary capacity. Subsequently, in 1928, negotiations were had between the city and the Federal government for the sale by the city to the United States of this plot for the site of a new Federal courthouse. In order to carry out these negotiations, the city proceeded to discontinue and close City Hall place, which was a part of the site.

Pursuant to section 442 of the Greater New York Charter, on November 14, 1929, the board of estimate and apportionment adopted a resolution approving a changed general map, which showed City Hall place between Duane street and Pearl street as closed.

It is conceded that the board of estimate and apportionment, in adopting this resolution on November 14, 1929, acted upon the erroneous information and belief that the city was in fact the owner of the fee of the land within the bed of City Hall place, between Duane street and Pearl street.

Thereafter the city physically closed this street. A curb was erected across the entire width of City Hall place at Pearl and Duane streets; a substantial steel chain link fence was erected for the entire width of the street; the old paving and curbing were removed. Access for vehicles was not possible. Access for pedestrians was possible only by proceeding over fences and walking along an uneven, unpaved surface. There were signs on the fences reading, " No Thoroughfare." Not only was City Hall place thus closed, but a new City Hall place was opened to take its place, shortly to the east of the old City Hall place and parallel to it, twenty-five feet in width.

Resolutions of the board of estimate and its committees, written communications and reports of city officials, and minutes of hearings before the board of estimate and apportionment, introduced in evidence, show conclusively that the city intended to, and actually did, close old City Hall place physically, as well as by resolution, and that it did open a new City Hall place as a substitute therefor.

It was not until November, 1930, that discovery was made that the city was not the fee owner of this land and that the information on which the board of estimate had acted in November, 1929, was wrong. When it was brought to the attention of the city authorities that the fee to the bed of the street had never been acquired by the city, the board of estimate and apportionment on May 8, 1931, adopted a resolution purporting to authorize the institution of this proceeding to take title to the bed of the street and to close the street pursuant to chapter 1006 of the Laws of 1895, as amended by chapter 752 of the Laws of 1923.

In accordance with the provisions of that chapter, the city presented its petition to the Supreme Court, setting forth the facts and requesting an order of the court " directing that the compensation which justly should be made to the respective owners of the real property affected or damaged by reason of the closing of City Hall Place between Duane Street and Pearl Street, in the Borough of Manhattan, City of New York, and also directing that the com-

pensation which justly should be made to the respective owners of the fee title to the land within the closed City Hall Place acquired herein, be ascertained and determined by this court without a jury."

The petition, when presented at Special Term, was opposed by certain claimants on practically the same grounds as urged upon the trial of the action. The application by the city of New York, however, was granted by an order dated August 10, 1931, resettled August 24, 1931, directing that compensation be determined in conformity with chapter 752 of the Laws of 1923. An appeal was taken from this order, but was subsequently withdrawn.

Some of the claimants who appeared before me at the trial of these proceedings did not appear at the time when the application of the city was presented at Special Term. On the trial, at the close of the petitioner's case and again at the conclusion of the entire case (with the exception of expert real estate testimony), all of the claimants moved to dismiss the proceeding on the ground that the court has no jurisdiction of the subject-matter, in that on the date when this proceeding was commenced, May 8, 1931, City Hall place was not a public street, that the statute applies only to public streets, not to private thoroughfares, and that, therefore, the statute does not authorize the institution or continuance of these proceedings.

Chapter 1006 of the Laws of 1895, as amended by chapter 752 of the Laws of 1923, applies only to public streets. That is clear from the definition of " street " as contained in subdivision 4 of section 1, which " includes street, avenue, road, alley, lane, highway, boulevard, and thoroughfare or part thereof, but only such as are *public*, and does not include marginal wharf." Section 2 of the statute refers in terms also only to *public* streets. In fact, even before the statute was expressly amended by chapter 752 of the Laws of 1923, to include this specific language, it had been held in its original form to be applicable only to public streets (*Matter of Wallace Avenue*, 222 N. Y. 139; *Matter of Mayor of New York City*, 41 App. Div. 586).

Section 442 of the charter in 1929 read as follows: " The board of estimate and apportionment is authorized and empowered, whenever and as often as it may deem it for the public interest so to do, to change the map or plan of the city of New York, so as to lay out new streets, parks, playgrounds, bridges, tunnels and approaches to bridges and tunnels and parks and playgrounds, and to widen, straighten, extend, alter and close existing streets and courtyards abutting streets, and to change the grade of existing streets shown upon such map or plan; also to lay out improvements of navigation

and to change improvements of navigation already laid out by establishing, on the recommendation of the commissioner of docks, bulkhead and pierhead lines in and along the waters within or separating parts of the city of New York, other than waters of the Hudson, East and Harlem rivers, New York bay, Kill von Kull, Arthur kill and Long Island sound. Notice of any proposed action of the board with reference to any such change in the map or plan of the city shall be published for ten days, in the City Record and the corporation newspapers, in which notice a date shall be fixed for a public hearing at which all persons interested in such change shall be heard, such date to be not less than ten days after the first publication of such notice. After the due publication of such notice, and after hearing protests and objections, if any there be, against the proposed change, if the said board shall favor such change, notwithstanding such protests and objections, and the same receives the approval of the mayor, such change in the map or plan of the city of New York, or in the grade of any street or streets shown thereon, or the bulkhead and pierhead lines so established, shall be deemed to have been made. Nothing herein contained shall affect or limit the powers vested in the commissioner of docks and the commissioners of the sinking fund by chapter sixteen of this act."

There can be no doubt of the city's intention legally and physically to close this street. While it is true that this intention was based upon a mistake in information, the proceeding before me was not brought to relieve the city from the effects of this error, assuming that any such proceeding would be now possible.

The action taken by the board of estimate and apportionment under section 442 of the charter effectively destroyed the public easements in the street, so that the public no longer had the right to travel over it. (*Reis* v. *City of New York*, 188 N. Y. 58.) This would seem to be the *sine qua non* of a public street. "So also in regard to highways. It has been truly said it is not the amount of travel upon a highway which distinguishes it as a public instead of a private road. A private road might have the larger amount. It is the right to travel upon it by all the world, and not the exercise of the right, which makes it a public highway. A public highway to which the public had not the right of access would be an impossible creation. And so a public use might generally be defined as the use which each individual might of right demand upon the same general terms and for the same general purposes as any other individual." (*Matter of Mayor, etc.*, 135 N. Y. 253, 260.)

What was done in legal effect by the resolution of the board of estimate and apportionment was carried out practically by the

complete and unreserved physical closing of the street directly thereafter. The street on the date when this present proceeding was commenced was no longer a public street, but a private way. It was accordingly not subject to the provisions of the statute under which it was brought.

The city cites as authority to the contrary *Matter of Mayor* (*Vanderbilt Avenue*) (95 App. Div. 533) and *Matter of Trull* v. *O'Brien* (210 id. 628). These cases hold that even though the public easements in a street had been destroyed by the filing of a map showing the streets in question as closed, nevertheless proceedings under chapter 1006 of the Laws of 1895 were properly brought later to extinguish the private easements which remained. Both of these cases arose under the original statute before the amendment of 1923. The original statute of 1895 contained the following provision in section 2, which was repealed by the amendments of 1923: " The provisions of this section shall apply to all streets, avenues, roads, highways, alleys, lanes and thoroughfares or parts or portions thereof which have not been retained or shown upon any map or plan heretofore made and filed by or on behalf of the local authorities of such city as part of the permanent system of public streets, avenues, roads, public squares and places in and for that part of such city included within the district laid out upon such map or plan, and which have not been thereafter re-established by law or relaid out or otherwise thereafter lawfully laid out and established."

In other words, when the statute of 1895 was passed it provided that the proceedings could be used for a street which had been shown as closed or which had been omitted from any official map filed before 1895. The act before 1923 specifically included within its provisions such streets as had been shown to be closed or omitted from a map filed prior to the date of its passage. This appears not only from the express language of the act but also from the opinion of Judge ANDREWS in *Matter of Scheibel* v. *O'Brien* (230 N. Y. 277, at p. 282), where he said: "A year later the so-called Street Closing Act (Laws of 1895, chap. 1006) was passed. Its main purpose was to affect the city of New York. But it was general in its terms, and while New York was at that time the only city of 1,250,000 inhabitants, it applied equally to all cities which might thereafter reach that limit. It empowered the local authorities ' in the manner hereinafter provided ' to close existing streets. They are to designate on a map only the streets which they may determine. to lay out as permanent streets, ' omitting therefrom all such former streets, * * * which they may determine to discontinue or close.' (Section 2.) On filing the map the streets shown on it shall be the only lawful streets, and any former street,

not shown thereon and not then open and in public use, shall cease to be a street and may be used by the owners of the fee. If when the permanent map is filed the street to be closed is actually open and used, if it is included within the plot bounded by the streets laid out on the permanent map, then when one of such boundary streets is opened, it shall cease for all purposes to be a street and the owner of the fee may occupy it. A limitation of six years to the right to compensation was imposed on those injured by the closing. So far the act provided for the future. The past was not neglected. If a map ' heretofore made and filed by or on behalf of the local authorities of such city' as part of its permanent system of streets showed a certain street was not to be retained then it was closed in the same manner as if it had appeared to be closed upon a future map. Only here, the limitation was not six years, but two, from the date of the statute."

When the amendment of 1923 was adopted, this provision of section 2 was not repeated, but was in express terms repealed. There is no authority, therefore, in the present act, as amended in 1923, authorizing this proceeding to close a street already shown to be closed on the prior map adopted by the board of estimate in November, 1929. It is true that section 6 of the original act of 1895 still remains in force as unrepealed, and refers to the filing of prior maps closing streets where no proceedings had been taken to determine compensation. This provision of section 5, however, refers only to " all cases where any map has been, *before the passage of this act,* made and filed as required by law." It is obvious that the city obtains no rights under this section, inasmuch as the map filed by it pursuant to section 442 of the charter was not filed before the passage of the act.

This proceeding cannot be maintained, therefore, under the statute pursuant to which it was brought. It is not a question of mere irregularity; it is one of jurisdiction. The statute confers jurisdiction upon the court to fix compensation in certain specified cases, for the taking of private property for a public purpose. If the kind of property referred to in the statute is not the kind of property which is in fact the subject of the proceeding, no jurisdiction is acquired by the court. The attack made by this motion goes to the jurisdiction of the subject-matter. (*Matter of City of New York [Juniper Avenue],* 162 App. Div. 291; appeal dismissed, 213 N. Y. 654; *Matter of City of Buffalo,* 78 id. 362.)

It is urged by the city that the claimants are foreclosed from raising their contention at this time, by reason of the fact that they were made at Special Term when the city's application was first presented; that they were overruled by the justice sitting in that part,

and that no appeal was prosecuted from such ruling. It maintains that the determination of the justice at Special Term establishes the " law of the case," which is binding in all subsequent proceedings.

The " law of the case " doctrine does not prevent consideration of this motion. The question raised is one of jurisdiction of the court. Such question may be raised at any time in the proceeding. (*Matter of Niagara Falls & Whirlpool Railway Co.*, 121 N. Y. 319; *Matter of City of Buffalo*, 78 id. 362.)

Additional reason exists for permitting the consideration of the question *de novo* at this time. When the question was decided at Special Term, some of the claimants who now appear at the trial and make this motion, had not yet appeared in the proceedings. Their time to do so had not expired, and they were not in default. The fact that they were not parties at the time of the prior determination would, obviously, prevent them from appealing therefrom. Consequently, they are not debarred from raising the question by the failure of the other claimants, who had actually appeared, to prosecute the appeal which they had taken.

We are not here dealing with the question as to whether or not a decree in a proceeding *in rem* such as this binds all parties and all persons who are entitled to become parties. We are here concerned with a technical rule of law, designed in the interest of expediency, which prevents a question of law being raised where it has been once decided and where no appeal has been prosecuted therefrom. Some of the claimants raising the question upon this trial were unable to appeal from the prior determination, and, consequently, should not in justice be precluded from raising the question of law upon which they rely. This would be the ordinary rule. It becomes even clearer when the question raised is one of jurisdiction of the court.

In granting this motion, the court does not intend to pass upon any of the number of other questions which are raised by these proceedings, namely, whether or not the city may take steps to undo its actions pursuant to section 442 of the charter; whether or not any other proceeding is proper to fix the compensation of these claimants; whether or not the land of the claimants had any more than a mere nominal value, because of the existence of the private easements of the city as the owner of all the land abutting City Hall place; whether or not the private easements of the city or any of its rights as an abutting owner were destroyed, as the claimants maintain, or whether, indeed, they could be constitutionally surrendered by any act of the city. The sole question here passed upon is whether or not City Hall place at the date of the commencement of this proceeding was a public street, and whether or not the statute involved is applicable thereto.